IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| JOANN G. BOARDS, | ) | C.A. NO. 3:09-CV-1671-CMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | OPINION AND ORDER |
| vs. | ) | GRANTING MOTION FOR |
| | ) | SUMMARY JUDGMENT |
| JOHN P. SOLOMON, PAMELA | ) | |
| WHITLEY, and LINDA FASHANU | ) | |
| in their individual capacities, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

This matter is before the court on Defendants' motion for summary judgment as to Plaintiff's

sole remaining claim which is pursued under 42 U.S.C. § 1983. Dkt. No. 42. Through this claim,

Plaintiff, Joann G. Boards ("Plaintiff"), alleges that Defendants, supervisory employees with the

South Carolina Department of Corrections ("SCDC"), violated her rights under the First Amendment

to the United States Constitution by terminating or demoting her in retaliation for engaging in

protected speech.[1]

Defendants' motion is based, in part, on the argument that the speech in question, bringing

audits Plaintiff performed as part of her job duties to the attention of her superiors, is not subject to

protection under the First Amendment. The undersigned agrees and grants the motion on this basis

and, alternatively, finds that Defendants are entitled to qualified immunity.

**STANDARD**

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials

on file, and any affidavits show that there is no genuine issue as to any material fact and that the

_____

[1] The First Amendment is applied to the states through the Fourteenth Amendment.

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995). Likewise, the non-moving party cannot create a genuine issue of material fact by presenting his or her own conflicting versions of events. *Barwick v. Celotex Corp.*, 736 F.2d 946, 960 (4th Cir. 1984) ("A genuine issue of material fact is not created where the only issue of fact is to determine which of the two conflicting versions of the plaintiff's testimony is correct.").

## BACKGROUND

**Parties.** Plaintiff is a former employee of SCDC. Dkt. No. 16 ¶1 (Amended Complaint ¶1). Throughout her relatively short employment with SCDC, Plaintiff was an at-will employee in a probationary status. *See* Plaintiff dep. at 13-14 (addressing positions held), 192 (addressing probationary and at-will status); Dkt. No. 45 at 2 (Plaintiff memorandum in opposition to summary judgment).[2] Plaintiff left her employment with SCDC in mid-May 2009, after she was first given the choice of a significant demotion or termination, and then told that she was being terminated before she could make the election. *See* Dkt. No 4-5 (Plaintiff memorandum conceding offer of alternate position but explaining why it was unacceptable); Plaintiff dep. at 200 (conceding memorandum given to her on May 15, 2009, stated that she was being demoted, not terminated, but stating that Solomon advised her that she would be terminated if she did not accept the demotion).[3]

---

[2] Most references to Plaintiff's deposition are drawn from Dkt. No. 42-8 (exhibit to Defendants' memorandum in support of summary judgment). Portions of Plaintiff's deposition (mostly duplicative of those in Dkt. No. 42-8) may also be found in Dkt. No. 47-4 (exhibit to Defendants' reply). Plaintiff has not submitted any portions of her deposition as exhibits although she does cite some pages not included in Defendants' submissions. For purposes of this order, the court has assumed that the pages on which Plaintiff relies which have not been provided support the propositions for which they are cited.

[3] Plaintiff further explained that she never considered accepting the demotion, although she asked for and was given the weekend to think it over. Plaintiff dep. at 200, 203-04 (indicating Solomon allowed her until "first thing" Monday to make a decision). Instead of coming to work on Monday, Plaintiff called in sick. *Id.* at 208. She also met with counsel on that date and returned to work on Tuesday, intending to decline the demotion. *Id.* at 207-09. When she went to advise Solomon of her decision, he advised her that her decision "didn't matter because he had already terminated her for shredding papers." *Id.* at 209. In an affidavit submitted in support of Defendants' reply, Solomon stated that before he met with Boards on Tuesday, an administrative assistant informed him that "Boards had 'cleaned out' her office and shredded or destroyed a large number of documents in her office." Dkt. No. 47-2 ¶ 7. Solomon further stated that he withdrew the offer of continued employment on this basis. *Id.* Although Plaintiff concedes that she shredded some documents and took others with her which she did not have a right to remove from SCDC, she denies that she shredded any large number of documents. *E.g.*, Plaintiff dep. at 200 (conceding

Defendants are all individuals who held some level of supervisory authority over Plaintiff during the latter months of her employment. Dkt. No. 16 ¶¶ 2-4. Defendant John P. Solomon ("Solomon") was the individual with ultimate hiring and firing authority over Plaintiff. *See* Plaintiff dep. at 37 (discussing meeting with Solomon in which she was given choice of demotion or termination); Dkt. No. 16 ¶2 (describing Solomon as the "Director of the Division" by which Plaintiff was employed and as a person in her direct line of supervision); *id*. ¶ 11 (describing Solomon's actions in demoting and terminating Plaintiff).

**Amended Complaint.** In her amended complaint, Plaintiff sets forth the factual basis of her various claims as follows:

> 8. The plaintiff was hired on June 2, 2008 as a Human Services Coordinator at the McCormick Correctional Institution and because of her exceptional skills, service and background and her familiarity with SCDC's auditing procedures was promoted in January of 2009 and sent to Columbia to work with and promote auditing, educational and special projects for SCDC.
>
> 9. In the course of her work assignments, the plaintiff made reports of serious mismanagement, including waste and fraud on the part of the management of the Division of Mental Health Services, including deficiencies that should have been disclosed by audit and the plaintiff reported the same to the defendant[s] Solomon, Whitley, Fashanu, and to others within the agency.
>
> 10. The plaintiff acted in a proper way in reporting such matters and insisting upon their disclosure but she soon became aware that the defendants Solomon, Whitley, Fashanu and others within management of the division did not want her to persist with her reports and began a hostile course of conduct towards the plaintiff, ignoring her, berating and threatening her and ultimately demanding that she revise the audit tool presently in use so that the same would incorrectly state data and cover up serious deficiencies and patient care neglect which the plaintiff refused to do, insisting upon proper auditing standards, including the same standards used in earlier

shredding some documents); *id*. at 35-37 (conceding that she "cleaned out her office" immediately after the May 15, 2009 meeting, taking "everything that [she] had done" based on her feeling that she was being "terminated for no reason"); *id*. at 37 (indicating that she subsequently returned documents after seeking advice of counsel).

times by the division and SCDC, contrary to the law and public policy of South Carolina.

11. Defendant Solomon, in retaliation and conspiracy with defendants Whitley and Fashanu on May 15, 2009 took away most of the plaintiff's responsibilities, reduced her salary, and offered her a far lower paying position with significantly decreased responsibilities at an institution 75 miles away from her home and shortly thereafter proceeded to terminate her employment on false and pretextual grounds.

Dkt. No. 16 ¶¶ 8-11.

Based on these factual allegations, Plaintiff asserted four causes of action: (1) a Section 1983 claim for violation of Plaintiff's rights of free speech and association; (2) a wrongful termination in violation of public policy claim; (3) a slander *per se* claim; and (4) a civil conspiracy claim. Dkt. No. 16. The second through fourth causes of action were subsequently dismissed, leaving only the Section 1983 claim for resolution. Dkt. No. 24 (granting motion to dismiss second through fourth causes of action).

**Subsequent Narrowing of Section 1983 Claim.** Plaintiff's Section 1983 claim has been further narrowed by consent through Plaintiff's response to Defendants' motion for summary judgment. First, Plaintiff expressly abandons pursuit of any claim for violation of her rights of association. Dkt. No. 45 at 10. Second, Plaintiff clarifies that the speech which she claims constitutes "protected speech" was not preparation of the audits themselves, which she concedes were part of her job duties, but her attempts to bring those audits to the attention of her superiors. Dkt. No. 45 at 6 ("The protected speech in the present case is to bring the results of the two audits she conducted to the attention of her superiors, something that she was not obligated to do. After performing the audits at Perry and McCormick, Plaintiff's only obligations, as she understood them at the time, where to bring the results to the attention of the audited facility's staff and to file away the audit reports themselves.").

Plaintiff also concedes that she is not asserting a First Amendment right to speak to her supervisor or participate in meetings, despite some suggestion to the contrary in her deposition.[4] Instead, she argues that her exclusion from meetings was part of the retaliatory course of conduct which, ultimately, resulted in Plaintiff being given the choice of termination or accepting a significant demotion. Dkt. No. 45 at 8-10. As Plaintiff explains in her opposition memorandum:

"[B]ut for" [her allegedly protected] speech, the record is absolutely devoid of any reason, other than an arbitrary and capricious desire to terminate a probationary

_____

[4] The following relevant exchange took place during Plaintiff's deposition:

Q.    Well, one of my questions to you then should be: If the audit reports were not protected speech, what protected speech did you engage in that you believe prompted you to be retaliated against?

A.    I guess it would be in the area of me whenever – me wanting to speak with Dr. Solomon concerning certain things in the audits and then as to what was going on, and he refused to speak with me, and the fact that they were having meetings behind closed doors concerning the audits and he did not include me in [those meetings]. He said to Ms. Anastasia that Joann was not to be there.

* * *

Q.    Okay. Well, other than attending meetings, is there any other speech that you believe you engaged in that prompted retaliation against you?

A.    I can't remember right now. I'm just lost.

* * *

Q.    Okay. How were you denied free speech?

A.    If I cannot speak to my supervisor concerning what is going on, then to me that would be denial of freedom of speech.

Plaintiff dep. at 149, 156, 159. Plaintiff also maintained that she had a "right" to attend meetings that related to her job, though perhaps not a right founded on the Constitution. *Id.* at 153. She subsequently conceded, however, that Dr. Solomon had the right to conduct meetings without her participation including meetings relating to the audits. *Id*. at 155-56. *See also id.* at 160-61 (providing Plaintiff two more opportunities to identify ways in which her freedom of speech was denied, and providing her a break in which to consider the issue, but receiving no further specification of the basis for Plaintiff's First Amendment claim).

employee who had done nothing but a commendable job, indeed going above and beyond what was required of her. *If this were a tort case from a jurisdiction recognizing the theory, this would be a case of res ipsa loquitor: Plaintiff engaged in protected speech about a matter of vital public interest, attempted to engage in more, was stonewalled, and then terminated without explanation.* What is particularly inexplicable is the roaring silence in the material subpoenaed from SCDC. Given the complete lack of evidence in the record for any other motive to terminate Plaintiff other than, of her own initiative, to bring to light matters of grave public concern that [were] potentially harmful or embarrassing to Defendants, there can be no other explanation other than she was terminated for engaging in protected speech.

Dkt. No. 45 at 9-10 (emphasis added). To the extent the complaint suggests any other bases for Plaintiff's Section 1983 claim, those bases have been abandoned by Plaintiff's failure to advance them in support of summary judgment and are precluded due to the absence of supporting evidence.[5]

**Factual Record.** Taken in the light most favorable to Plaintiff, the record evidence is as follows. Plaintiff was first hired by SCDC on June 3, 2008, as a "Lead Counselor" at McCormick Correctional Institution. Plaintiff dep. at 13. She apparently performed well in that position and was promoted to Director of Audits and Training in SCDC's Division of Mental Health Services ("Director of Audits") in January 2009. *Id.* at 14.

During her tenure as Director of Audits, Plaintiff prepared two audits which are central to her allegations in this action. Both audits were prepared in March 2009, and were highly critical of the two institutions being reviewed. *E.g.*, Dkt. No. 42-4 (Perry Correctional Institution Audit), 42-5 (McCormick Correctional Institution Audit).

---

[5] These unsupported allegations include that Plaintiff was retaliated against for "insisting upon [the audits'] disclosure[,]" presumably to persons beyond her immediate supervisory chain, and was required to "revise the audit tool . . . [to] incorrectly state data and cover up serious deficiencies . . . which the plaintiff refused to do." Dkt. No. 16 ¶10. Plaintiff has proffered no evidence to support either allegation. Moreover, the allegation that she opposed revision to the audit tool is directly contrary to her deposition testimony conceding that she did not express any opposition to the audit revisions as shown in the April 27, 2009 memorandum. Plaintiff dep. at 121.

On March 27, 2009, after these audits were prepared, Solomon sent a memorandum to Plaintiff and others stating that he had asked Defendant "Pamela Whitley to assist [him] in providing direct supervision to selected mental health staff on a interim basis." Dkt. No. 42-3. The memorandum did not note any specific concerns but did indicate that Solomon had discussed his concerns regarding these employees with Whitley and James Page, who was to assist with supervision in Whitley's absence. Plaintiff was aware that she was one of the probationary employees to whom this additional supervision (and underlying concerns) applied. Plaintiff dep. at 96.

Prior to receiving this memorandum, Plaintiff was informed by Whitley that Solomon "was not pleased with [her] work." *Id*. at 96-97. Plaintiff also assumed or understood that Solomon's displeasure involved the way she had worded the first audit as she was required "to rechange that [audit] and rechange it and rechange it[.]" *Id.* at 97. Plaintiff felt that Solomon "just didn't like me and the way that I did things because I was not a team player[.]" *Id*. (also stating her impression that Solomon felt she was "doing wrong," presumably through her approach to the audits).[6]

In April 2009, Plaintiff was asked to and did participate in one or more meetings to update or alter the "audit tool" which was used in conducting these audits. *Id.* at 87-88. She did not express any opposition to the proposed revisions to the audit tool as set out in a memorandum dated April 27, 2009. *Id.* at 121.

---

[6] In affidavits submitted with Defendant's reply, Solomon and Whitley identify a single deficiency in Plaintiff's performance: her written communication skills. Dkt. No. 47-2 ¶ 5 (Solomon affidavit); Dkt. No. 47-3 ¶ 4 (Whitley affidavit). Although the affidavits suggest other possible concerns with Plaintiff's "ability to handle the duties of the position of Director of Audits and Training," no other specific deficiencies are noted. *Id*. Because the court resolves Defendants' motion on other grounds, it need not decide whether these affidavits were properly submitted on reply.

On Friday, May 15, 2009, Solomon met with Plaintiff to advise her that she would not be allowed to continue as Director of Audits. *Id.* at 36 (addressing meeting on May 15 in which she received notice of her demotion); Dkt. No. 42-2 (May 15, 2009 memorandum). Solomon's decision was memorialized in a memorandum of that same date which stated that Solomon had previously advised Plaintiff of his concerns regarding her performance, that the deficiencies had not been corrected, and that she was being offered "the opportunity to resume" her former job position, albeit at a different (and apparently distant) correctional facility. Dkt. No. 42-2.

At the conclusion of the May 15, 2009 meeting, Solomon either suggested or Plaintiff requested that she be allowed to consider her options over the weekend. *Id.* at 200, 203-04. Immediately after this meeting, Plaintiff began to "clean out" her office, shredding some documents and removing others. *Id.* at 35-37, 200. She did so based on a belief that she "was being railroaded" or "terminated for no reason. *Id.* at 35-36 ("I took every paperwork, everything that I had done because I knew that perhaps that I would need this knowing that I was terminated for no reason."). After being informed of Plaintiff's actions in shredding or removing documents or both, Solomon withdrew the offer of an alternative position and, instead, terminated her. *See supra* n. 3.

## DISCUSSION

In light of the consensual narrowing of Plaintiff's claims as set forth above, the issues remaining for resolution are as follows: (1) whether Plaintiff's actions in bringing the audits to the attention of her superiors were sufficiently beyond the scope of her job duties to constitute "protected speech"; (2) if so, whether there is evidence to support the remaining elements of her *prima facie* case; and (3) whether, assuming there is sufficient evidence to support a *prima facie* case, Defendants are, nonetheless, entitled to qualified immunity.

For the reasons set forth below, the court concludes that Plaintiff's actions in bringing the audits to the attention of her superiors do not constitute "protected speech." The court need not, therefore, reach the remaining questions. The court, nonetheless, addresses the issue of qualified immunity, concluding that even if the speech was subject to protection, the right to such protection was not clearly established at the relevant time.

## I.     Protected Speech

As the United States Supreme Court explained in *Garcetti v. Ceballos*:

> Restricting speech that owes its existence to a public employee's professional responsibilities does not infringe any liberties the employee might have enjoyed as a private citizen. It simply reflects the exercise of employer control over what the employer itself has commissioned or created.
>
> *  *  *
>
> The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes.

*Garcetti v. Ceballos*, 547 U.S. 410, 421-425 (2006)(emphasis added).

Consistent with this standard, various courts have held that a public employee's speech is not protected by the First Amendment if it "owes its existence" to his or her professional responsibilities. *McGee v. Public Water Supply, Dist. # 2 of Jefferson County*, *Mo.*, 471 F.3d 918, 921 (8th Cir. 2006) (finding district manager's opposition to board decision which was adverse to his recommendation was still "pursuant to his official duties" and, therefore, not subject to a First Amendment claim in light of *Garcetti*); *Williams v. Dallas Independent School Dist.*, 480 F.3d 689, 694 (5th Cir. 2007) ("Simply because Williams wrote memoranda, which were not demanded of him, does not mean he was not acting within the course of performing his job"). As the Fifth Circuit recently explained, "the case law is unanimous in holding that [an] employee's communications that

10

relate to his own job function up the chain of command, at least within his own department or division, fall within his official duties and are not entitled to First Amendment protection." *Davis v. McKinney*, 518 F.3d 304, 313 n.3 (5th Cir. 2008).

Plaintiff, whose full title was Director of Audits and Training in SCDC's Division of Mental Health Services, concedes that her job duties included preparing the audits in question. Thus, she does not allege that preparation of the audits constitutes protected speech as, indeed, it could not under *Garcetti*. Instead, she maintains that she engaged in protected speech by drawing the audits to the attention of her superiors. She maintains that this falls outside the limitation imposed by *Garcetti* because she was not obligated to do anything beyond giving a copy of the audit to the institution involved and filing the audit away in her files.

The court disagrees. Plaintiff's alleged actions of bringing the results of the audits to the attention of her superiors was clearly speech that "owed its existence" to her professional responsibilities as Director of Audits for SCDC. Even if she was not strictly required to bring the audits to the attention of her superiors, her actions in doing so were clearly within the scope of her duties, particularly given that she was still a probationary employee, had recently been promoted to this position, was preparing her first few audits, and had identified what she believed to be substantial irregularities in the audited facilities. A reasonable employee in this position would not "bury" the audits in the file, as she argues she was entitled to do. Dkt. No. 45 at 6-7 (arguing Plaintiff "could have 'buried' the audit results and have gone along her merry way"); Plaintiff dep at 173-74 (denying any obligation to give a copy to her supervisors, but conceding that Whitley had required Plaintiff to allow Whitley to review all documents before delivery to Solomon). Thus,

even if delivery to the supervisory personnel was not strictly required, Plaintiff's decision to do so was still well within the scope of her job duties.

Plaintiff's testimony that Solomon required her to "rechange" the audits several times is also inconsistent with her claim that drawing the results of the audits to his attention was beyond the scope of her job responsibilities. Plaintiff dep. at 97. Whether or not providing copies to her superiors was within Plaintiff's written job description or other formal job requirements, this testimony demonstrates that Solomon not only had the right but also elected to review the audits which Plaintiff prepared and to have input as to their final form. It follows that any voluntary action by Plaintiff in drawing the audits to his attention was not beyond the scope of her job duties.

Therefore, in light of *Garcetti* and *Davis*, the court finds that Plaintiff's actions in drawing the audits to the attention of her superiors are quintessential examples of speech made pursuant to job duties, not speech subject to protection under the First Amendment. In light of this conclusion, the court declines to address the other elements of Plaintiff's *prima facie* case.

## II. Qualified Immunity

For reasons addressed above, the court concludes that the speech at issue is not protected speech. Even were the court to conclude otherwise, it would find that the protected nature of the speech was not clearly established at the time Plaintiff was given the choice between termination and demotion. It follows that Defendants could not have violated a clearly established right and would, consequently, be entitled to qualified immunity. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (holding that governmental officials performing discretionary functions are shielded from liability for money damages so long "as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."); *see also Mills v. Stegner*,

64 Fed. Appx. 864, 874 (4th Cir. 2003) ("Although plaintiffs have prevailed in some First Amendment retaliation cases, most do not, simply because the individualized assessment required by the *Pickering* balancing test means we can rarely say that the law was clearly established and that reasonable officials would have been aware of the law.")

## CONCLUSION

For the reasons set forth above, the court concludes that Plaintiff has failed to present evidence that she engaged in speech subject to protection under the First Amendment and, alternatively, that Defendants are entitled to qualified immunity because the speech in question was not clearly established to be subject to protection at the relevant time. Defendants are, therefore, entitled to summary judgment on Plaintiff's sole remaining cause of action for violation of 42 U.S.C. § 1983. All other claims have previously been previously dismissed, the court directs entry of judgment in favor of Defendants.

IT IS SO ORDERED.

s/ Cameron McGowan Currie
CAMERON MCGOWAN CURRIE
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
May 26, 2010